# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

-------------------------------------------------- x
                            :

DOUGLAS, U.[1],                      :         3:23-CV-673 (MPS) (RMS)
*Plaintiff,*                :

                            :

V.                            :

                            :

KILOLO KIJAKAZI, ACTING         :
COMMISSIONER OF THE SOCIAL    :
SECURITY ADMINISTRATION[2],   :
*Defendant.*               :

                            :         MAY 30, 2024

                            :

-------------------------------------------------- x

## <u>RECOMMENDED RULING ON THE PLAINTIFF'S MOTION TO REVERSE AND THE DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER</u>

---

[1] To protect the privacy interests of social security litigants while maintaining public access to judicial records, in opinions issued in cases filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), this Court will identify and reference any non-government party solely by first name and last initial(s). *See* Standing Order – Social Security Cases (D. Conn. Jan. 8, 2021).

[2] When the plaintiff filed this action, he identified "Commissioner of Social Security" as the named defendant. (*See* Doc. No. 1). Thereafter, in connection with his Motion to Reverse, the plaintiff identified "Kilolo Kijakazi, Acting Commissioner of Social Security" as the named defendant. (*See* Doc. No. 13). On December 20, 2023, Martin O'Malley was appointed as Commissioner of the Social Security Administration. As such, insofar as the plaintiff is currently proceeding in this action against then-Acting Commissioner of the Social Security Administration, Kilolo Kijakazi, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley should be substituted for Kilolo Kijakazi as the defendant in this matter.

This is an administrative appeal following the denial of the plaintiff's applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to Title II and XVI of the Social Security Act (the "Act").[3]  It is brought pursuant to 42 U.S.C. § 405(g).[4]

The plaintiff now moves for an order reversing and remanding the decision of the Commissioner of the Social Security Administration (the "Commissioner"), and awarding benefits.  (*See* Doc. No. 13 at 1).  In the alternative, the plaintiff seeks an order remanding the case for further administrative proceedings.  (*See id.*).  The Commissioner, in turn, has moved for an order affirming his decision.  (*See* Doc No. 14).

For the reasons described herein, the Court respectfully recommends that the plaintiff's motion for an order reversing and remanding the ALJ's decision be **DENIED**, and the Commissioner's motion for an order affirming that decision be **GRANTED**.

## I.    <u>PROCEDURAL HISTORY</u>

On May 19, 2019 and February 28, 2020, the plaintiff filed applications for DIB and SSI benefits, respectively, each with an alleged onset date ("AOD") of October 15, 2018.  (*See* Doc. No. 10, Certified Transcript of Administrative Proceedings, dated July 24, 2023 ["Tr."] at 152–58,

---

[3] Eligibility for DIB is premised, in part, on a disabled claimant's "insured status" under the Act, *i.e.*, payment into Social Security through employment income for a set period prior to application.  *See* 42 U.S.C. §§ 423(a)(1)(a), *id.* at 423(c)(1).  "SSI payments are a form of public assistance unrelated to the recipient's earnings or employment" but also require a finding of disability.  *Sykes v. Bank of Am.*, 723 F.3d 399, 405 (2d Cir. 2013); *see* 42 U.S.C. § 1382(a).  "Determinations of disability under Title II and Title XVI of [the Act] are governed by parallel regulations that are, as relevant here, equivalent."  *Spottswood v. Kijakazi*, No. 23-54-CV, 2024 WL 89635, at *1 (2d Cir. Jan. 9, 2024) (summary order) (citing *Smith v. Berryhill*, 139 S. Ct. 1765, 1772 (2019)).

[4] Under the Act, the "Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under [the Act]." 42 U.S.C. §§ 405(b)(1), 1883(c)(1)(A). The Commissioner's authority to make such findings and decisions is delegated to an administrative law judge ("ALJ"). *See* 20 C.F.R. §§ 404.929, 416.1429. The plaintiffs can appeal an ALJ's decision to the Social Security Appeals Council.  *See* 20 C.F.R. §§ 404.967, 416.1467.  If the Appeals Council declines review or affirms the ALJ's decision, then the claimant may appeal to the United States district court.  Section 205(g) of the Act provides that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).

166–175).  The plaintiff's DIB application was denied initially on October 15, 2019, and again upon reconsideration on January 14, 2020.  (Tr. 79, 95).  On August 31, 2020, a hearing was held before Administrative Law Judge ("ALJ") Dierdre Horton, regarding the plaintiff's DIB and SSI applications.  (Tr. 31–63).  Thereafter, on September 17, 2020, ALJ Horton issued an unfavorable decision, denying the plaintiff DIB and SSI benefits.  (Tr. 7–25).  On January 4, 2022, the Appeals Council denied the plaintiff's request for review, thereby making ALJ Horton's decision the final decision of the Commissioner.  (Tr. 1).

On March 6, 2022, the plaintiff filed a Complaint against the Commissioner in the United States District Court for the District of Connecticut, pursuant to 42 U.S.C. § 405(g).  (*See* Tr. 764–65); *Douglas, U. v. Commissioner of Social Security*, No. 3:22-CV-356 (SRU) (Doc. No. 1).  On August 19, 2022, in connection with the plaintiff's first-filed civil action, the Commissioner filed a motion—with the plaintiff's consent—to enter a judgment with a reversal and remand to the Commissioner for further administrative proceedings.  (Tr. 753–54).  On August 23, 2022, United States District Judge Stefan R. Underhill granted the Commissioner's motion and remanded the case for further proceedings.  (Tr. 755–56).  Accordingly, on September 8, 2022, the Appeals Council ordered the ALJ to conduct a new hearing and issue a new decision that addressed certain deficiencies in the ALJ's initial findings.  (Tr. 760–61).

On December 21, 2022, a remand hearing was held before ALJ Horton.  (*See* Tr. 697–727).  Thereafter, on January 25, 2023, ALJ Horton issued another unfavorable decision, finding that the plaintiff was not disabled.  (Tr. 669–696).

On May 23, 2023, the plaintiff filed the Complaint in this pending action.  (Doc. No. 1).  On June 21, 2023, this case was referred to the undersigned for the issuance of a Recommended Ruling.  (*See* Doc. No. 9).  On August 22, 2023, the plaintiff filed his Motion to Reverse the

Decision of the Commissioner (Doc. No. 13), along with a supporting memorandum (Doc. No. 13-1) and a statement of material facts (Doc. No. 13-2). Thereafter, on September 21, 2023, the Commissioner filed a Motion to Affirm (Doc. No. 14), along with her own supporting memorandum (Doc. No. 14-1). On October 7, 2023, the plaintiff filed a reply brief in further support of his Motion to Reverse. (Doc. No. 15).

## II.   FACTUAL BACKGROUND

The Court presumes the parties' familiarity with the plaintiff's medical history, which is thoroughly discussed in the parties' briefing. (*See* Doc. Nos. 13, 14). The Court cites only the portions of the record that are necessary to explain this decision.

### A.   The Plaintiff's Hearing Testimony

On December 21, 2022, the plaintiff appeared telephonically for a hearing before ALJ Horton regarding the instant disability application.[5] (*See* Tr. 697–727). At the hearing, the plaintiff's non-attorney representative, Polly Leane Hernandez, first provided an opening statement whereby she confirmed that the plaintiff was seeking a closed period of disability, from October 15, 2018 to March 1, 2020, after which time the plaintiff returned to work at the substantial gainful activity ("SGA") level.[6] (Tr. 701). Ms. Hernandez further urged the ALJ to find that, "due to the residual symptoms that [the plaintiff] experienced from having a stroke," the plaintiff is limited to simple, unskilled work, in light of the physical and mental health challenges that the plaintiff experienced during his period of disability. (*Id.*).

Next, the ALJ heard from the plaintiff, who initially testified that he presently resided in Milford, Connecticut, where he has lived with his wife for over 25 years. (Tr. 702). The plaintiff

---

[5] The hearing was conducted telephonically due to the extraordinary circumstance presented by COVID-19.

[6] Based on wage statements included in the record, as well as the plaintiff's testimony at his original hearing held on August 31, 2020, it appears that following his closed period of disability, the plaintiff returned to work as a sales representative for Vivint Solar Developer, LLC. (*See* Tr. 39, 188).

then testified that due to issues with his eyesight he was unable to drive at all during the first six or seven months of his period of disability, and thereafter retained only a very limited ability to drive. (Tr. 702–04). During that time, either his wife or his children would primarily give the plaintiff rides. (Tr. 704). The plaintiff testified that, beginning in 2020, following his period of disability, he experienced improvement in his eyesight and ability to judge distances and speed, which allowed him to drive more regularly, albeit with some continued discomfort. (*Id.*).

The plaintiff testified that during his period of disability, his wife took care of their home, and "prepared all the food." (Tr. 705). The plaintiff also described his energy levels as "very, very low" during this period, and reported a frequent need to lay down and take naps. (Tr. 705–06). The plaintiff further indicated that he experienced problems with standing, walking, balance, and even sitting during his period of disability, and that he was unable to stand for more than a minute or two, or walk 100 steps. (Tr. 706–07). Additionally, the plaintiff testified that despite being a "former world-class athlete," during his alleged period of disability, he could only lift about ten pounds and was "lucky if [he] could carry a bottle of milk." (Tr. 707). As for the use of his hands, the plaintiff indicated that he could not make a fist and needed his wife's assistance in getting dressed. (*Id.*). The plaintiff also testified that he could not write or type, and was constantly dropping things (*e.g.*, glasses, dishes, and pens). (Tr. 707–08).

Next, the plaintiff testified as to his issues with mental functioning during the alleged period of disability. More specifically, the plaintiff described having a hard time focusing and concentrating on any task, and also experiencing frequent memory issues that ultimately resulted in his wife taking over paying bills due to the plaintiff's forgetfulness. (Tr. 708–09). The plaintiff further testified that, as a result of his memory issues, he experienced related problems with following instructions. (Tr. 709). The plaintiff stated that he was totally isolated during the alleged

period of disability and was unable to engage in his usual social life or activities. (*Id.*). Consequently, the plaintiff experienced bouts of depression, anxiety, and stress. (Tr. 709–710). Lastly, the plaintiff testified that he returned to work as soon as he possibly could, "[b]ecause [he's] a worker" and has been "working for 45 years of continued work." (Tr. 710).

After the plaintiff's examination by Ms. Hernandez, ALJ Horton also questioned the plaintiff regarding the improvements in his physical and mental health that began around March 2020, which allowed the plaintiff to return to gainful employment. (*See* Tr. 710). In response, the plaintiff indicated that he experienced a gradual improvement in his memory and speech, as well as his ability to write and type.[7]

### B.    The VE's Testimony

Vocational expert ("VE") Michael Smith also testified at the plaintiff's hearing on December 21, 2022. (Tr. 716–726). First, VE Smith addressed the plaintiff's past work as an Executive Recruiter (DOT 166.267-038), a skilled, sedentary position. (Tr. 717). Next, the ALJ presented VE Smith with a hypothetical involving an individual with the plaintiff's age, education, and work background, who was limited to "light work, occasional ramps and stairs, no ladders, ropes, scaffolds[,] [and] [o]ccasional balanc[ing], stoop[ing], kneeling, crouching, [and] crawling," and must otherwise "avoid concentrated exposures to extreme heat and humidity[,] [n]o hazardous machinery or unprotected heights[,] and limited to frequent handling and fingering." (*Id.*). VE Smith testified that the hypothetical individual would be able to perform the plaintiff's past work as an Executive Recruiter, even with the additional limitation to frequent reaching. (Tr. 717–18). Next, the ALJ asked whether the same hypothetical individual would be able to perform

---

[7] During this portion of the plaintiff's hearing, the plaintiff further clarified—at the behest of VE Michael Smith— that his prior employment as an Executive Recruiter did not require the plaintiff to lift and/or carry up to 100 pounds and was otherwise not performed at a heavy exertional level. (Tr. 712–16).

the plaintiff's past work as an Executive Recruiter with the added limitation to only occasional handling, fingering, or reaching. (Tr. 718). To that end, the VE testified that the hypothetical individual would not be able to perform the plaintiff's past work. (*Id.*). Likewise, even if the hypothetical individual was no longer limited to only occasional handling, fingering, and reaching, but was limited to simple routine tasks, he would not be able to perform the plaintiff's past work. (*Id.*).

Next, VE Smith testified that as an Executive Recruiter (*i.e.*, a skilled position), there is not a pre-determined maximum of tolerable off-task behavior (*e.g.*, ten percent or twenty percent of a given workday, etc.). (*See* Tr. 718–19). Rather, VE Smith indicated that there might "be more flexibility with time off task for this type of work, say up to 20 maybe even 25% . . . as along as the job was getting done." (*Id.*). However, VE Smith further emphasized that less off-task time could still become work preclusive if the off-task behavior led to a consistent failure to meet certain quotas or targets. (Tr. 719–720). Similarly, VE Smith testified that "unscheduled absences beyond once a month would likely not be tolerated," due to a resulting effect on productivity. (Tr. 720).

Ms. Hernandez then asked VE Smith a series of questions. First, VE Smith confirmed that, in responding to the ALJ's hypothetical, he did not "consider any factors or limitations beyond those which [the ALJ] specifically noted," but did consider the nature of the plaintiff's past work as an Executive Recruiter. (Tr. 721). VE Smith further confirmed that his opinion was based on his own understanding of how the Executive Recruiter position is commonly performed, as well as the plaintiff's testimony and the DOT. (*Id.*). VE Smith also testified that an Executive Recruiter must possess an ability to speak and type effectively, use a computer and email to communicate, and otherwise successfully contact individuals at various different companies during normal business hours, to help them "fill positions," sometimes on an urgent basis. (Tr. 722, 725). As

such, VE Smith further confirmed that an individual who had either a moderate or profound difficulty making decisions, or who could only work in one-hour increments with a 30-minute break in between, would not be able to perform the job of Executive Recruiter.  (Tr. 723–25). Lastly, VE Smith confirmed that his testimony was consistent with the DOT, and that any topics not directed addressed in the DOT (*e.g.*, maintaining focus, handling stress, effective communication, off-task behavior, and absenteeism) were based on his professional knowledge. (*Id.*).

### C.    Objective Medical Evidence[8]

The administrative record does not contain any contemporaneous medical treatment records from the alleged period of disability precisely regarding the plaintiff's medically determinable mental impairments (*e.g.*, depressive disorder with anxious distress).  Indeed, there is no evidence that the plaintiff received any medical treatment for mental health issues during the relevant period.  Nevertheless, certain treatment records, including those regarding the plaintiff's cerebrovascular accident ("CVA") (*i.e.*, stroke) and the plaintiff's other physical ailments, include remarks as to the plaintiff's mental status.

On September 17, 2018, the plaintiff presented to Multicare Medical Center ("Multicare") in Milford, Connecticut, for a visit with his primary care provider ("PCP"), Dr. Michael S. Wong, M.D.  (Tr. 349).  At that time, the plaintiff had experienced at least one recent CVA.  (*Id.*).  At Multicare, the plaintiff complained of, *inter alia*, word-finding issues and balance, and requested an MRI and a referral to Yale Rheumatology.  (*Id.*).  On September 26, 2018, the plaintiff received

---

[8] The following recitation of the objective medical evidence is based upon the parties' briefing, the ALJ's decision, and the Court's own review of the administrative record.  Nevertheless, insofar as the Court generally presumes the parties' familiarity with the administrative record as a whole, the Court's recitation is limited to the plaintiff's mental impairments, including those which purportedly stem from the plaintiff's CVA.  Indeed, the Court does not set forth the myriad objective evidence regarding the plaintiff's other, physical impairments (*e.g.*, obesity, osteoarthritis, psoriasis, and CVA), because the plaintiff is not challenging the ALJ's RFC determination—or any other aspect of the ALJ's decision—as it relates to the plaintiff's physical limitations.

an MRI of his brain, which revealed a "small focus of acute ischemia involving the left pons" and "old left-sided lacunar infarcts." (Tr. 362).

Consequently, on October 10, 2018, the plaintiff was seen by neurologist Adam Jasne, M.D., in connection with the aforementioned MRI. (Tr. 406–410). There, the plaintiff complained of dizziness, fatigue, and balance issues, as well as difficulties with typing and speech. (Tr. 407). Upon examination, Dr. Jasne noted that the plaintiff was pleasant, cooperative, and in no acute distress. (Tr. 409). Dr. Jasne further indicated that the plaintiff was alert and oriented, exhibited normal concentration, language, and fund of knowledge, and was able to follow simple commands with no left-right confusion. (*Id.*).

On October 23, 2018, the plaintiff again visited Multicare for an appointment with Dr. Wong. (Tr. 353–56). Upon physical examination, Dr. Wong noted that the plaintiff was well nourished, did not appear acutely ill, and was otherwise alert and oriented, but that the plaintiff was anxious and depressed. (Tr. 360).

On October 30, 2018, the plaintiff visited rheumatologist Dr. Xuemei Dong, M.D., in connection with his joint pain and psoriasis. (Tr. 400–404). There, the plaintiff was observed as, *inter alia*, alert, oriented, and in no acute distress, albeit anxious. (Tr. 401, 403). Notes from this visit also indicate that the plaintiff had experienced improved balance and typing ability. (Tr. 403).

On November 5, 2018, the plaintiff presented to Milford Hospital for an evaluation of high blood pressure stemming from a reported increase in stress and anxiety. (Tr. 371). There, the plaintiff underwent a physical examination, which indicated that the plaintiff was well nourished, in no acute distress, alert and oriented, with intact motor and sensation and normal speech and gait. (Tr. 372).

On November 16, 2018, the plaintiff visited with urologist Stanton Honig, M.D., and notes from that appointment suggest that the plaintiff had recovered from his earlier CVA. (Tr. 396).

On December 5, 2018 and February 6, 2019, the plaintiff visited a cardiac specialist, who noted that the plaintiff appeared in no acute distress, and "appropriate to conversation." (Tr. 393).

On January 28, 2019, the plaintiff attended a follow up appointment with Dr. Honig, who noted that the plaintiff was alert and oriented to person, place, and time, and exhibited normal mood, behavior, judgment, and thought content. (Tr. 392).

On April 11, 2019 and June 14, 2019, the plaintiff presented to dermatologist Frank Santoro, M.D., for follow ups regarding his psoriasis. (Tr. 445–48). Notes from both of those appointments indicate that the plaintiff was in no apparent distress, was well developed and nourished, was alert and oriented, and exhibited normal mood and affect. (Tr. 446, 448).

On May 6, 2019, the plaintiff visited Multicare for another appointment with his PCP, Dr. Wong. (Tr. 357–361). Upon physical examination, Dr. Wong noted that the plaintiff did not appear acutely ill and was otherwise alert and oriented, but that the plaintiff was anxious and depressed. (Tr. 360). At this appointment, the plaintiff reported that he is depressed and wanted to restart medication to help him quit cigarettes. (Tr. 357).

On September 30, 2019, the plaintiff presented to Dr. Herbert Reiher, M.D. for a consultative "internal medicine examination." (Tr. 545–48). There, the plaintiff complained of, *inter alia*, decreased focus and difficulty typing. (Tr. 545). Upon observation, Dr. Reiher noted, *inter alia*, that the plaintiff did not appear in acute distress, and that he was able to complete various activities of daily living, including cooking, laundry, showering and dressing himself, and leisure activities (*e.g.*, watching TV and reading), though he did not clean or shop. (Tr. 546). Moreover, as part of this examination, Dr. Reiher conducted a "mental status screen" which noted that the

plaintiff was appropriately dressed, maintained good eye contact, appeared "oriented in all spheres," and did not exhibit any evidence of hallucinations, delusions, impaired judgment, or significant memory impairment. (Tr. 547–48).

### D.    Medical Opinion Evidence[9]

In assessing whether the plaintiff's mental limitations were severe at Step Two of the five-step sequential analysis, *see* 20 C.F.R. § 404.1520(a)(4)(ii), the ALJ considered the prior administrative findings of Dr. Christopher Leveille, Psy.D. and Dr. Susan Uber, Ph.D, at both the initial and reconsideration levels. (*See* Tr. 677 (citing Tr. 72, 88–89)). Both Dr. Leveille and Dr. Uber determined that the plaintiff was mildly limited in his ability to: (1) understand, remember, and apply information; (2) interact with others; (3) concentrate, persist, and maintain pace; and (4) adapt and manage himself. (*See* Tr. 72, 88). Dr. Leveille and Dr. Uber also emphasized the plaintiff's lack of mental health treatment, and further concluded that "the clinical data offers no objective evidence to suggest the presence of a severe [psychological] impairment," and that the plaintiff's mild mental deficits are "likely to remain non-severe by 12 months." (*Id.*). In addition, Dr. Uber remarked that the plaintiff's post-CVA neurocognitive deficits had improved, "and at this point would not be considered significant barriers to employment." (Tr. 89).

Later, in assessing the plaintiff's RFC, the ALJ considered the medical opinion of consultative examiner Dr. Kristin Wrocklage, Ph.D. (*See* Tr. 466–475). Dr. Wrocklage performed an examination of the plaintiff on July 1, 2019. (Tr. 466). At the examination, the plaintiff reported, *inter alia*, that since his stroke in September 2018, he was experiencing difficulty with communicating, word-finding, and decision-making. (Tr. 466–67). While the plaintiff reported

---

[9] As with the objective medical evidence, the Court's recitation of the available medical opinion evidence in the record is limited to evidence related to the plaintiff's mental impairments.

no history of mental health treatment or psychotic symptoms, he did indicate that, post-stroke, he had experienced a decreased range of emotion, as well as decreased motivation, energy, interest, and enjoyment. (Tr. 467). The plaintiff further reported independence in many of his daily activities, including driving, grocery shopping, cooking, and other household tasks, but indicated that his wife had assumed responsibility for managing the household finances due to the plaintiff's lack of income. (Tr. 468).

Following her examination of the plaintiff, Dr. Wrocklage concluded that the plaintiff:

is able to follow brief, single-step and multi-step instructions. He is able to complete visuomotor processing tasks in a timely manner, but he may have difficult typing quickly and error-free, as reported by [the plaintiff]. He is able to focus his attention over a brief period. He is capable of effective mental arithmetic operations. He will have mild to moderate difficulty learning new information that is conveyed to him verbally, but he will generally remember what he learned. He will be able to recall information that he sees better than information that he hears. He is able to think abstractly and flexibly, though his processing speed may slow down with increasing task complexity or with multi-tasking demands. He is able to understand conversational speech and to convey his point through verbal communication. However, he may experience delayed word-finding. Based on his report, he may have profound difficulty making decisions. Socially, he is able to engage but he reported decreased motivation and confidence to do so, in part, because of his reported speech/language difficulties. He appears capable of keeping attendance though physical pain/discomfort could affect his attendance at times. Given reported distress upon attempts to resume some operations of his business, he will have at least moderate difficulty managing the stressors of a routine workday at this time.

(Tr. 471).

The ALJ found that Dr. Wrocklage's opinion was minimally persuasive, and in so finding, emphasized that the opinion was based on a one-time examination of the plaintiff and that Dr. Wrocklage did not have the opportunity to treat the plaintiff or otherwise track his medical progress. (Tr. 687). The ALJ further concluded that some of Dr. Wrocklage's findings were based on the plaintiff's self-reporting, as opposed to the objective evidence, and that, in fact, Dr. Wrocklage's overall findings were inconsistent with the other evidence of record. (*Id.*). More

specifically, the ALJ refuted the consistency of Dr. Wrocklage's findings as to the plaintiff's decreased motivation, difficulty performing tasks, maintaining attendance, learning new verbal information, and managing the stressors of a routine workday. (*Id.*). The ALJ highlighted that the plaintiff did not require formal mental health treatment after his stroke, that he self-reported an ability to complete an array of daily tasks and follow instructions, and that the record as whole indicated that the plaintiff presented at other examinations with no significant memory impairments, normal concentration skills, normal funds of knowledge, normal thought content, and the ability to follow commands. (*Id.*). The ALJ also contested Dr. Wrocklage's finding that the plaintiff had "profound" difficulties with decision making, because the plaintiff self-reported that he could dress himself, drive, and cook, and otherwise presented at the consultative examination with intact insight and judgment. (*Id.*).

## III.   **THE ALJ'S DECISION**

The ALJ must follow a five-step evaluation process as promulgated by the Commissioner to determine whether a claimant is disabled within the meaning of the Act. *See* 20 C.F.R. § 404.1520(a).[10]

---

[10] An ALJ determines a claimant's disability using a five-step analysis. *See* 20 C.F.R. § 404.1520. First, an ALJ must determine whether a claimant is currently working. *See* 20 C.F.R. § 404.1520(a)(4)(i). If a claimant is currently employed, then the claim is denied. *Id.* If a claimant is not working, then an ALJ must make a finding as to the existence of a severe mental or physical impairment. If none exists, then the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii). If a claimant is found to have a severe impairment, then the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations ("the Listings"). *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79–80 (2d Cir. 1998). If a claimant's impairment meets or equals one of the impairments in the Listings, then the claimant is automatically considered disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If a claimant's impairment does not meet or equal one of the listed impairments, then the claimant must show at the fourth step that he cannot perform his former work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). If a claimant shows that he cannot perform his former work, then the burden shifts to the Commissioner to show at Step Five that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if he shows that he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

At Step One, the ALJ found that while the plaintiff has engaged in SGA since March 1, 2020, he did not work at SGA levels between October 15, 2018, and March 1, 2020. (Tr. 675). Accordingly, the ALJ concluded that there has been a continuous 12-month period during which the plaintiff did not engage in SGA. (Tr. 676).

At Step Two, the ALJ determined that the plaintiff had the following severe impairments: "obesity, left knee osteoarthritis (status post (s/p) arthroscopy) and cerebrovascular accident." (*Id.*). The ALJ further found that, while the plaintiff also presented with hypertension, diabetes, obstructive sleep apnea, bilateral peripheral arterial disease, and psoriasis, those impairments were non-severe. (Tr. 676–77). Likewise, the ALJ concluded that the plaintiff's "medically determinable mental impairment of depressive disorder with anxious distress does not cause more than minimal limitations in his ability to perform basic mental work activities and is therefore, non-severe." (Tr. 677–78). In so finding, the ALJ evaluated each of the four areas of mental functioning used to assess whether a claimant's mental impairments meet or medically equal the severity of one of the listed impairments (the "Listings"). (*See* Tr. 677); *see also* 20 C.F.R. Part 404, Subpart P, Appendix 1. More specifically, the ALJ determined that the plaintiff had only a "mild" limitation in each of the areas of mental functioning (*i.e.*, understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself). (Tr. 677–79). Lastly, the ALJ specifically emphasized that her ensuing RFC formulation "considered the functional limitations resulting from all of [the plaintiff's] medically determinable impairments, including the non-severe impairments." (Tr. 679).

At Step Three, the ALJ found that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the Listings. (Tr. 679–80);

*see generally* 20 C.F.R. Part 404, Subpart P, Appendix 1. First, the ALJ evaluated whether the plaintiff's impairments met the criteria for Listing 1.17 regarding reconstructive surgery or surgical arthrodesis of a major weight-bearing joint. *See* 20 C.F.R. Part 404, Subpart P, App'x 1, § 1.17; (Tr. 679). In doing so, the ALJ emphasized that, while the plaintiff had undergone total knee replacement surgery, "there was no documented medical need for a walker, bilateral canes or bilateral crutches or a wheeled and seated mobility device involving the use of both hands." *See id.* Next, the ALJ considered whether the plaintiff's impairments met the criteria for Listing 1.18 regarding abnormality of a major joint in any extremity. (*Id.*); *see* 20 C.F.R. Part 404, Subpart P, App'x 1, § 1.18. There, the ALJ determined that there was no evidence documenting the plaintiff's need for a walker, bilateral canes, or bilateral crutches, and further emphasized that the plaintiff presented with a normal gait at numerous examinations and otherwise "reported being able to bathe and dress himself, drive a motor vehicle, cook, and perform light cleaning activities." (*Id.*) Lastly, having evaluated the record evidence, the ALJ determined that the plaintiff's impairments did not meet Listing 11.04 for "vascular insult to the brain." (Tr. 680); *see* 20 C.F.R. Part 404, Subpart P, App'x 1, § 11.04.

Next, the ALJ formulated the plaintiff's RFC. A claimant's RFC is the most that he can do despite his impairments, and is determined by assessing all of the relevant evidence. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ determined that the plaintiff had the RFC to perform:

> light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he can occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. He must not climb ladders, ropes, or scaffolds. He must avoid concentrated exposure to extreme heat and humidity. He must have no exposure to hazardous machinery or unprotected heights. He can frequently handle and finger.

(Tr. 680).

At Step Four, the ALJ further found that the plaintiff was capable of performing his past relevant work as an Executive Recruiter (DOT 166.267-038), which did not require the

performance of work-related activities precluded by his RFC. (Tr. 688). The ALJ determined that the plaintiff could perform the work of an Executive Recruiter as both actually and generally performed. (*Id.*) The ALJ also emphasized VE Smith's testimony that a person with the same age, education and work background as the claimant with the same RFC could perform the Executive Recruiter job, and that the VE's testimony was consistent with the DOT. (*Id.*).

Having found that the plaintiff was capable of performing his past relevant work, the ALJ did not proceed to Step Five of the sequential analysis.

Given these findings, the ALJ determined that the plaintiff was not disabled. (*Id.*).

## IV. **STANDARD OF REVIEW**

"A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). The Court's function is to first ascertain whether the ALJ applied the correct legal principles in reaching their conclusion, and then whether the decision is supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. § 405(g); *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012). Therefore, absent legal error, this court may not set aside the decision of the Commissioner if it is supported by substantial evidence. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). Substantial evidence means more than a scintilla, "[i]t means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 400 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 229 (1938)). The substantial evidence standard is "a very deferential standard

of review—even more so than the 'clearly erroneous' standard," and the Commissioner's findings of fact must be upheld unless "a reasonable factfinder would *have to conclude otherwise*." *Brault*, 683 F.3d at 448 (emphasis in original) (citations omitted); *see also Wagner v. Sec'y of Health & Human Serv's.*, 906 F.2d 856, 860 (2d Cir. 1990) (when reviewing a denial of DAC, a district court may not make a *de novo* disability determination). "[A district court] must 'consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight.'" *Petrie v. Astrue*, 412 F. App'x 401, 403–04 (2d Cir. 2011) (quoting *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)).

"Such a deferential standard, however, is not applied to the Commissioner's conclusions of law." *Muntz v. Astrue*, 540 F. Supp. 2d 411, 418 (W.D.N.Y Mar. 17, 2008) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)). "This court must independently determine if the Commissioner's decision applied the correct legal standards in determining that the plaintiff was not disabled." *Id*. "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson*, 817 F.2d at 986.

## V.    **DISCUSSION**

In his appeal, the plaintiff broadly challenges the ALJ's omission of any mental limitations in the plaintiff's RFC and raises two specific arguments. First, the plaintiff claims that the ALJ committed harmful error by failing to accurately interpret and adequately consider Dr. Jasne's notation that the plaintiff could follow simple commands, and then incorporate a related limitation into the plaintiff's RFC. (*See* Doc. No. 13-1 at 3–8). Second, the plaintiff contends that the ALJ

erred by failing to incorporate the plaintiff's medically determinable, non-severe mental impairments into the plaintiff's RFC. (*Id.* at 8–16). In response, the Commissioner argues that: (a) the ALJ accurately interpreted Dr. Jasne's notation and reasonably relied upon it; and (b) the plaintiff's non-severe mental impairments did not warrant the inclusion of any resulting functional limitations in the ALJ's RFC assessment. (*See* Doc. No. 14-1 at 6–12).

For the reasons set forth herein, the Court agrees with the Commissioner. More specifically, the Court finds that: (1) the ALJ's interpretation of the plain language of Dr. Jasne's treatment notes was reasonable, and supported by substantial evidence; and (2) the ALJ did not otherwise err by formulating an RFC without mental limitations, despite accepting the plaintiff's medically determinable, non-severe depressive disorder with anxious distress. Consequently, the Court respectfully recommends that the plaintiff's motion for an order reversing or remanding the ALJ's decision be **DENIED**, and the Commissioner's motion for an order affirming that decision be **GRANTED**.

## A.    The ALJ's RFC Assessment

Fundamentally, the plaintiff contends that the ALJ erred by failing to formulate an RFC that adequately incorporated the plaintiff's "proven" mental limitations.

### 1.    Dr. Jasne's Treatment Notes

First, the plaintiff argues that the ALJ erred by failing to incorporate the plaintiff's "retained ability to 'follow simple commands'" into his RFC. (Doc. No. 13-1 at 3). Specifically, the plaintiff contends that the ALJ repeatedly relied upon a notation by the plaintiff's neurologist, Dr. Adam Jasne, that the plaintiff could follow simple commands, and yet, erroneously omitted any such limitation from the plaintiff's RFC. (*See id.* (citing Tr. 677, 678, 681, 683, 687)). The plaintiff emphasizes that an "RFC finding must include all of the limitations the ALJ has found to

be supported by the evidence of record," and further argues that the ALJ misinterpreted Dr. Jasne's treatment notes and improperly substituted his own lay opinion in finding that the plaintiff was "unlimited in his ability to follow commands."[11] (*Id.* at 3–4).

In response, the Commissioner asserts that Dr. Jasne's notation did not warrant inclusion into the plaintiff's RFC. (Doc. No. 14-1 at 6). In doing so, the Commissioner emphasizes a distinction between Dr. Jasne's statement that the plaintiff *could* follow simple commands, as opposed to a conclusive indication that he was *limited* to following simple commands. (*Id.*). As such, and because other evidence in the record undermines the notion that the plaintiff's mental impairments caused more than minimal functional limitations, the Commissioner insists that the ALJ did not err in failing to include a limitation to simple commands in the plaintiff's RFC. (*Id.* at 6–7). The Court agrees with the Commissioner.

Dr. Jasne is a neurologist who appears to have treated the plaintiff on a single occasion, on October 10, 2018.[12] (*See* Tr. 406–410). There, the plaintiff primarily complained of post-CVA dizziness, as well as issues with his typing, speech, and handwriting. (*Id.*). Dr. Jasne did not perform a consultative examination of the plaintiff, and the purpose of the appointment appears wholly unrelated to any evaluation of the plaintiff's work-related mental functional limitations. (*See id.*). Indeed, as argued by the Commissioner, "at no time did Dr. Jasne opine on [p]laintiff's limitations or ability to perform work-related activities." (Doc. No. 14-1 at 6). Rather, Dr. Jasne evaluated the plaintiff for dizziness and, in performing a related assessment of the plaintiff's

---

[11] The plaintiff further emphasizes that the ALJ relied on Dr. Jasne's findings in concluding that Dr. Wrocklage's medical opinion was minimally persuasive. (Doc. No. 13-1 at 6–7). Nevertheless, the plaintiff does not appear to be challenging the ALJ's evaluation of the medical opinion evidence and/or her compliance with the regulations governing opinion evidence. Moreover, as argued by the Commissioner, the ALJ's reliance on the plaintiff's ability to follow simple commands was merely "one of the many findings in support of [the ALJ's] conclusion that Dr. Wrocklage's opinion [was] minimally persuasive." (*See* Doc. No. 14-1 at 9). As such, even if the plaintiff were challenging the ALJ's evaluation of Dr. Wrocklage's opinion, and even assuming *arguendo* that the ALJ misinterpreted Dr. Jasne's findings, the ALJ's conclusions remain supported by substantial evidence.

[12] Notably, this appointment took place prior to the plaintiff's AOD of October 15, 2018.

mental status, noted that the plaintiff "follows simple commands with no left-right confusion." (Tr. 409).  Based on that notation alone, the plaintiff claims that the ALJ's RFC should have included a related limitation to following simple commands. (Doc. No. 13-1 at 3).  Moreover, the plaintiff insists that remand is warranted, "[s]ince the ALJ relied on an exaggerated version of Dr. Jasne's findings to inform all of her decision-making in this case."  (Doc. No. 15 at 1).  The Court is not convinced.

As an initial matter, in the Court's view, the plain language of Dr. Jasne's treatment notes did not indicate that the plaintiff was either limited or unlimited in his ability to follow commands; the notes merely stated that, during a mental status evaluation on October 10, 2018, the plaintiff followed Dr. Jasne's simple commands.  (*See* Tr. 409).  The plaintiff argues that this one-time notation amounts to a "proven limitation," solely because it is emphasized in the ALJ's decision on several occasions.  (Doc. No. 13-1 at 3; Doc. No. 15 at 1–2).  Not so.  That the ALJ's decision regularly cites Dr. Jasne's statement—and appears to credit it—does not itself result in a "proven limitation," nor does it command incorporation into the plaintiff's RFC.

Additionally, and contrary to the plaintiff's contentions, the ALJ did not rely solely on Dr. Jasne's treatment notes in evaluating the plaintiff's mental limitations, including whether he was limited in his ability to follow commands.  As set forth in more detail *infra* Point V(A)(2), the ALJ thoroughly evaluated the plaintiff's mental impairments in accordance with the regulations and the record evidence, determined that they were non-severe, considered their potential resulting functional limitations, and ultimately declined to incorporate them into the plaintiff's RFC.  As part of her RFC discussion, the ALJ determined that the plaintiff's purported cognitive issues were not consistently recorded in his treatment notes.  (Tr. 683).  In support of that finding, the ALJ

cited Dr. Jasne's notation that the plaintiff could follow simple commands.[13]  (*See* Tr. 681, 683).

However, the ALJ also cited to the plaintiff's own SSA Function Report Form, which indicated

that he could "come pretty close" to following written instructions and otherwise could follow

spoken instructions.  (*See* Tr. 683 (citing Tr. 274)).  The ALJ further emphasized that, "outside of

the [plaintiff's] subjective complaints, he presented and admitted to no significant memory or

judgment impairments, normal funds of knowledge, normal concentration skills, normal speech,

[and] normal insight and judgment."  (Tr. 683).  Lastly, the ALJ highlighted that the plaintiff did

not require formal mental health treatment following his stroke.  (*Id.*).  Therefore, even if the ALJ

had misinterpreted Dr. Jasne's notation, these additional bases for omitting a related limitation

from the plaintiff's RFC are substantial, and would render any such erroneous "exaggeration"

harmless.

For the foregoing reasons, the Court finds that the ALJ reasonably interpreted Dr. Jasne's

finding, and did not commit harmful error in omitting a related limitation from the plaintiff's RFC.

## 2.    The Plaintiff's Non-Severe Mental Impairments

Next, the plaintiff argues that "an ALJ's RFC finding must include all of the limitations

the ALJ found to be supported by the evidence of record, whether arising from severe impairments

or non-severe impairments," and that, consequently, the ALJ should have incorporated the

plaintiff's medically determinable mental impairments into the plaintiff's RFC, even though the

ALJ found them to be non-severe at Step Two.  (Doc. No. 13-1 at 8–9).  In response, the

Commissioner concedes that an ALJ is obligated to *consider* whether a claimant's non-severe

---

[13]  In his motion, the plaintiff argues that, "in the ALJ's analysis after step three, she inexplicably omitted the qualifier
of 'simple' when citing Dr. Jasne's medical finding."  (Doc. No. 13-1 at 4).  This is not entirely accurate, insofar as
the cited portion of the ALJ's analysis relied not only on Dr. Jasne's finding, but also on the plaintiff's own SSA
Function Report Form, which indicated that he could "come pretty close" to following written instructions and
otherwise could follow spoken instructions.  (*See* Tr. 683 (citing Tr. 274)).  In this regard, the Court does not view the
ALJ's omission of the word "simple" as inexplicable, or as signifying the ALJ's imposition of her own lay
interpretation of the medical evidence.

impairments impose any functional limitations, but contends that "consideration does not compel a finding of limitations," and that here, the absence of mental limitations in the RFC should not be construed as signifying the ALJ's lack of due consideration. (Doc. No. 14-1 at 5). Rather, the Commissioner insists that the ALJ adequately explained her rationale for omitting mental limitations from the plaintiff's RFC, including that the plaintiff's mental impairments caused only mild limitations not resulting in any functional work-related restrictions. (*Id.* at 11). Once again, the Court agrees with the Commissioner, and finds that the ALJ did not err by formulating an RFC without mental limitations, despite accepting the plaintiff's medically determinable, non-severe depressive disorder with anxious distress.

At Step Two, the ALJ measured the plaintiff's depressive disorder with anxious distress in accordance with the regulations for evaluating mental disorders, also referred to as the psychiatric review technique ("PRT"). *See* 20 C.F.R. §§ 404.1520a, 416.920a; (Tr. 678–79). In accordance with these regulations, the ALJ assessed the extent to which the plaintiff's depression and anxiety caused limitations in each of the four broad categories of his mental functioning: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. *See id.* Incorporating a thorough examination of the record evidence, the ALJ determined that the plaintiff was only mildly limited in each of those four areas. (Tr. 678–79). In reaching those conclusions, the ALJ emphasized that, at the plaintiff's various appointments and examinations in 2018 and 2019, he consistently demonstrated normal moods, socially appropriate behavior, normal judgment, normal concentration, normal funds of knowledge, average processing speeds, average verbal comprehension, and average IQ, and otherwise exhibited an ability to follow simple commands and answer questions appropriately with no significant memory impairments. (*Id.* (citing Tr. 397,

409, 446, 469–470, 937)).  The ALJ also highlighted that the plaintiff reliably reported an ability to follow instructions, manage his personal care, and engage in various daily activities.  (*Id.* (citing 270, 406, 468–69)).  Further, the ALJ relied upon the prior administrative findings of Dr. Leveille and Dr. Uber, who both determined that the plaintiff was only mildly limited in each of the four areas of mental functioning, and cited the plaintiff's lack of formal psychiatric treatment in support of their findings.  (*See* Tr. 677 (citing Tr. 72, 88–89)).  Consequently, the ALJ concluded that the plaintiff's "medically determinable mental impairment of depressive disorder with anxious distress does not cause more than minimal limitations in his ability to perform basic mental work activities and is therefore, non-severe."  (Tr. 677–78).

Later, in formulating the plaintiff's RFC, the ALJ "considered the functional limitations resulting from all of [the plaintiff's] medically determinable impairments, *including the non-severe impairments*" (emphasis added), but ultimately declined to incorporate into the RFC any limitations stemming from the plaintiff's depressive disorder with anxious distress, or any other mental impairment.  (Tr. 679–680).  The ALJ indicated that the record evidence did not support a finding of any additional functional limitations beyond those set forth in the RFC, and further emphasized that "the overall evidence of record supports that [the plaintiff] does not have a residual cognitive impairment related to his CVA," and that the plaintiff's "depressive disorder does not cause more than minimal functional limitations in his ability to perform work-related activities."  (Tr. 679, 683).

The plaintiff argues that the ALJ's Step Two findings of mild limitation in the four areas of mental functioning should have been incorporated into the plaintiff's RFC, and that "the ALJ here never provided any basis for excluding the limitations she found proven in the record from the RFC."  (Doc. No. 13-1 at 15).  In doing so, the plaintiff seemingly urges the Court to adopt a

rule whereby an ALJ must specifically set forth a detailed justification for omitting a claimant's mild, non-severe mental impairments from the RFC assessment, and that any failure to do so warrants remand. (*See id.* at 11–15; Doc. No. 15 at 3). This argument is unconvincing, and indeed, courts in this Circuit are hesitant to impose such an exacting standard. Rather, the Court agrees with the Commissioner that, when a non-severe "mental impairment causes only mild limitations that do not result in any functional work-related restrictions, the ALJ does not err by formulating an RFC without mental limitations." (Doc. No. 14-1 at 10). Under these circumstances, the ALJ need only *consider* whether a claimant's mild mental limitations impose any functional restrictions, and only if they do, formulate the RFC accordingly. 20 C.F.R. § 404.1545(a)(2); *Novas v. Kijakazi*, No. 22-CV-1020, 2023 WL 2614362, at *11 (S.D.N.Y. March 8, 2023), *report and recommendation adopted*, 2023 WL 2613550 (S.D.N.Y. March 23, 2023).

What precisely constitutes adequate "consideration" in this context appears to be the source of some uncertainty in this Circuit. Some courts have suggested that sufficient consideration of a plaintiff's non-severe mental impairments can be grounded—at least in part—in the ALJ's comprehensive mental function analysis at Step Two. *See, e.g.*, *Nersten v. O'Malley, Comm'r of Soc. Sec.*, No. 23-1036, 2024 WL 1985995, at *2 (2d Cir. May 6, 2024) (summary order) (concluding that substantial evidence supported ALJ's omission of the plaintiff's mental disorder from his RFC assessment because, having conducted the mental function analysis at Step Two, the ALJ determined that the plaintiff's mental disorder "created no relevant workplace limitations for [the plaintiff], not because the ALJ failed to consider it"); *Beliana M. v. Comm'r of Soc. Sec.*, No. 3:21-CV-646 (SALM), 2022 WL 596045, at *9 (D. Conn. Feb. 28, 2022) (finding that the ALJ's obligation to account for limitations imposed by both severe and nonsevere impairments "does not support the proposition that an ALJ must include a restriction in the RFC if, at step two, he finds

mild limitations resulting from a nonsevere impairment . . . [instead] he must consider whether any functional restrictions exist because of the mild limitations, and, only if they do, incorporate those restrictions into the RFC"); *Cromwell v. Comm'r of Soc. Sec.*, No. 18-CV-1194 (FPG), 2020 WL 409989, at *2 (W.D.N.Y. Jan. 24, 2020) (finding no error when the ALJ explicitly considered in its Step Two analysis the functional limitations resulting from the plaintiff's non-severe impairments, and then, "in his RFC analysis, . . . cited evidence supporting his conclusion that plaintiff's non-severe mental impairments do not warrant any restrictions").

By contrast, other courts have emphasized that the Step Two and RFC analyses are "analytically distinct," and that, as such, the ALJ's assessment at Step Two "does not relieve them of the requirement to discuss Plaintiff's mental health impairments in formulating the RFC" and clearly explain why those impairments do not require any RFC accommodation. *Coulter v. Comm'r of Soc. Sec.*, 673 F. Supp. 3d 365, 376–77 (S.D.N.Y. 2023) (citing *Garcia v. Commissioner of Social Security*, No. 21-CV-1230 (SDA), 2022 WL 4234555, at *14 (S.D.N.Y. Sept. 14, 2022)); *see also Mandy C. v. Saul*, No. 18-CV-982 (CFH), 2020 WL 1245348, at *5–6 (N.D.N.Y. March 16, 2020) (finding that remand was warranted where ALJ failed to explain basis for omitting mental limitations in RFC despite finding non-severe major depressive order at Step Two); *MacDonald v. Commissioner of Social Security*, No. 17-CV-921 (LJV), 2019 WL 3067275, at *3–4 (W.D.N.Y. July 11, 2019) (holding that remand was warranted where ALJ found mild limitations in three areas of mental functioning, but did not mention them in formulating the plaintiff's RFC). In particular, courts have criticized "boilerplate" statements made by an ALJ at Step Two that the ALJ "considered Plaintiff's non-severe impairments and that his RFC determination accommodated them," and have instead required that the ALJ "[do] more." *Beliana*

*M.*, 2022 WL 596045 at *9 (citing *Cromwell*, 2020 WL 409989, at *2; *MacDonald*, 2019 WL 3067275, at *3–4).

The Court finds that, in this case, the ALJ did "do more," and therefore adequately considered the plaintiff's non-severe mental impairments in her RFC formulation. Under any interpretation of "consideration," courts agree that the record must show "that the ALJ actually considered [the plaintiff's] mental issues when addressing her RFC." *Beliana M.*, 2022 WL 596045 at *9; *Coulter*, 673 F. Supp. 3d at 377. Here, at Step Two, the ALJ assessed each of the plaintiff's four areas of mental functioning and set forth—in considerable detail—her reasons for finding no more than mild limitations. (Tr. 678–79). The ALJ explicitly determined that the record evidence did "not otherwise indicate that there [was] more than a minimal limitation in the claimant's ability to do basic work activities."[14] (Tr. 679). In so finding, the ALJ repeatedly cited to treatment records from the plaintiff's various appointments and examinations in 2018 and 2019, as well as the plaintiff's own self-reporting. (Tr. 678–79). Thereafter, in connection with her RFC formulation, the ALJ "did more," by describing the record evidence pertaining to the plaintiff's non-severe mental impairments, and then plainly stating that the record did not support the existence of a mental impairment related to the plaintiff's CVA, or otherwise permit a finding that that the plaintiff's depressive disorder with anxious distress caused more than minimal functional limitation in his ability to perform work-related activities. (*See* Tr. 683). In sum, the ALJ's analysis at both Steps Two and Four clarifies her rationale and demonstrates that she adequately considered the plaintiff's non-severe mental impairments in formulating the plaintiff's RFC. *See*

---

[14] In his reply brief, the plaintiff argues that the ALJ's explanation for omitting mental limitations from the RFC is "boilerplate," and therefore insufficient. (Doc. No. 15 at 3–4). Moreover, the plaintiff contends that the ALJ's analysis at Step Two "did nothing to explain why the specific functional limitations identified by the ALJ had no impact on [the plaintiff's] ability to work." (*Id.* at 4). The Court disagrees, and reiterates its finding that the ALJ adequately considered the plaintiff's non-severe mental impairments in her RFC analysis, and determined that they did not warrant any limitations.

*Beliana M.*, 2022 WL 596045 at *9 (stating, "[t]he ALJ's opinion *as a whole* demonstrates that he considered any potential nonexertional restrictions, and substantial evidence supports his determination that none were necessary.") (emphasis added).

For the foregoing reasons, the Court finds that the ALJ's decision set forth a sufficient explanation for her omission of the plaintiff's mild mental limitations from his RFC, and that the ALJ committed no error.[15]

## VI.    CONCLUSION

For the reasons set forth above, the Court respectfully recommends that the plaintiff's motion for an order reversing or remanding the ALJ's decision be **DENIED**, and the Commissioner's motion for an order affirming that decision be **GRANTED**.

This is a recommended ruling.  *See* Fed. R. Civ. P. 72(b)(1).  Any objections to this recommended ruling must be filed with the Clerk of the Court within fourteen (14) days after filing of such order.  *See* D. Conn. L. Civ. R. 72.2(a).  Any party receiving notice of an order or recommended ruling from the Clerk by mail shall have five (5) additional days to file any objection.  *See* D. Conn. L. Civ. R. 72.2(a).  Failure to file a timely objection will preclude appellate review. *See* 28 U.S.C. § 636(b)(1); Rules 6(a) & 72 of the Federal Rules of Civil Procedure; D. Conn. L. Civ. R. 72.2; *Impala v. United States Dept. of Justice*, 670 F. App'x 32 (2d Cir. 2016) (summary order) (failure to file timely objection to Magistrate Judge's recommended ruling will preclude further appeal to Second Circuit); *Small v. Sec'y of H.H.S.*, 892 F.2d 15 (2d Cir. 1989) (*per curiam*).

---

[15] The Commissioner further argues that, because the plaintiff does not challenge the ALJ's finding that the plaintiff's depressive disorder with anxious distress was not severe, the plaintiff has therefore conceded "that his mental impairments did not significantly limit his ability to perform the basic mental demands of work."  (*See* Doc. No. 14-1 at 4–5). Because the Court has recommended that the plaintiff's Motion to Reverse be denied on other grounds, it declines to address this argument.

It is so ordered this 30th day of May, 2024, at New Haven, Connecticut.

 /s/ Robert M. Spector, U.S.M.J.
ROBERT M. SPECTOR
UNITED STATES MAGISTRATE JUDGE